**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUESETTS**

| | |
|---|---|
| MUKESH KUKREJA and TIMOTHY WELSH, Derivatively on Behalf of SYMBOTIC, INC.<br><br>Plaintiffs,<br><br>v.<br><br>RICHARD B. COHEN, CAROL J. HIBBARD, ROLLIN FORD, CHARLES KANE, TODD KRASNOW, VIKAS J. PAREKH, DANIELA RUS, and MERLINE SAINTIL,<br><br>Defendants,<br><br>and<br><br>SYMBOTIC, INC.,<br><br>Nominal Defendant. | Case No:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Mukesh Kukreja and Timothy Welsh (together, "Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Symbotic, Inc. ("SYM," "Symbotic," or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from January 19, 2024 through the present (the "Relevant Period") and have caused substantial harm to the Company.

## JURISDICTION

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received

substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiffs

6. ***Plaintiff Mukesh Kukreja*** ("Kukreja") is, and was at all relevant times since May 23, 2024, a shareholder of the Company's Class A common stock. Plaintiff Kukreja will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

7. ***Plaintiff Timothy Welsh*** ("Welsh") is, and was at relevant times since March 3, 2024, a shareholder of the Company's Class A common stock. Plaintiff Welsh will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

8. ***Nominal Defendant Symbotic*** is a Massachusetts corporation with its principal executive offices located at 200 Research Drive, Wilmington, MA 01887. The Company's common stock trades on the NASDAQ Stock Market (the "NASDAQ") under the symbol "SYM."

### Director Defendants

9. ***Defendant Richard B. Cohen*** ("Cohen") has served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board since 2022. Defendant Cohen previously served as CEO of Symbotic LLC from November 2017 to April 2022.[1]

10. ***Defendant Rollin Ford*** ("Ford") has served as a director of the Company at all relevant times since 2022. Defendant Ford also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Ford also served as a member of the Warehouse advisory board from August 2016 until June 2022.

11. ***Defendant Charles Kane*** ("Kane") has served as a director of the Company at all relevant times since 2022. Defendant Kane also serves as the chair of the Audit Committee. Defendant Kane also served as a member of the Warehouse advisory board from October 2020 until June 2022.

12. ***Defendant Todd Krasnow*** ("Krasnow") has served as a director of the Company at all relevant times since 2022. Defendant Krasnow also serves as the chair of the Compensation Committee. Defendant Krasnow also served as a member of the Warehouse advisory board from May 2016 until June 2022.

13. ***Defendant Vikas J. Parekh*** ("Parekh") has served as a director of the Company at all relevant times since 2022. Defendant Parekh also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

14. ***Defendant Daniela Rus*** ("Rus") has served as a director of the Company at all relevant times since 2023.

---

[1] Symbotic LLC was one of the companies involved in the June 2022 merger between Warehouse Technologies LLC ("Warehouse") and SVF Investment Corp. 3 ("SVF") which led to the formation of Symbotic Inc. as it presently exists. The merger agreement was by and among Warehouse, SVF, Symbotic LLC, and Saturn Acquisition (DE) Corp.

15. ***Defendant Merline Saintil*** ("Saintil") has served as a director of the Company at all relevant times since 2022. Defendant Saintil also serves as the chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Saintil also served as a member of the Warehouse advisory board from October 2021 until June 2022.

16. Defendants Cohen, Ford, Kane, Krasnow, Parekh, Rus, and Saintil are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

17. ***Defendant Carol J. Hibbard*** ("Hibbard") was, at all relevant times since December 15, 2023, the Chief Financial Officer ("CFO") and Treasurer of the Company. Prior to this, Defendant Hibbard served as the Company's CFO designate from October 2023 through to December 2023.

18. The Director Defendants and Defendant Hibbard are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

19. The Company develops, implements, and operates end-to-end supply chain automation technology in the United States and Canada.

20. The Company automates the processing of pallets and cases in large warehouses and distribution centers builds and operates automated warehouse systems for clients in the United States with intentions to expand to Canada and Europe.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

21. On January 19, 2024, the Company filed the 2024 Proxy Statement with the SEC pursuant to § 14(a) of the Securities Exchange Act of 1934. The 2024 Proxy Statement was solicited by the Director Defendants and called for shareholder approval of, *inter alia*: (1) the reelection of the Director Defendants to the Board; and (2) the ratification of the selection of Grant Thornton LLP as the Company's independent registered public accounting firm for its fiscal year ending September 28, 2024.

22. The 2024 Proxy Statement contained the following information, in relevant part:

> **Code of Business Conduct and Ethics**
>
> We have adopted a written code of business conduct and ethics that will apply to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. … In addition, we intend to post on our website all disclosures that are required by law or Nasdaq listing standards concerning any amendments to, or waivers from, any provision of the code of business conduct and ethics. The information on any of our websites is deemed not to be incorporated in this proxy statement or to be part of this proxy statement.
>
> ***
>
> **Role of Board in Risk Oversight**
>
> Risk is inherent in every business, and how well a business manages risk can ultimately determine its success. We face a number of risks, including risks relating to the implementation of our business model, our ability to compete in the markets we serve, our ability to raise financing in the future, potential cyberattacks and intrusions and the protection of our intellectual property. Management is responsible for the day-to-day management of risks we face, while our board of directors, as a whole and through its committees, has responsibility for the oversight of risk management. In its risk oversight role, our board of directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed.
>
> The role of the board of directors in overseeing the management of our risks is conducted primarily through committees of the board of directors, as disclosed in the descriptions of each of the committees above and in the charters of each of the committees. Our audit committee is also responsible for discussing our policies with respect to risk assessment and risk management.

23. Under the direction and watch of the Director Defendants, the 2024 Proxy Statement was materially false and misleading because the above-referenced statements failed to disclose the risks of slow deployment times, seasonality, and the potential impact of the macro environment on the Company's future profitability which were known, or should have been known, to the Director Defendants in the exercise of prudent business judgment. As such, the foregoing statement in the 2024 Proxy Statement was a half-truth, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20. Furthermore, the Director Defendants' statement regarding the Company's Code of Conduct was materially false and misleading because the Director Defendants were not adhering to the Code of Conduct and were, in fact, acting in violation of the Code of Conduct.

24. As a result of the Director Defendants causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

25. On February 5, 2024, the Company issued a press release announcing its first quarter results for fiscal year 2024. Therein, the Company reported "revenue of $369 million, a net loss of $13 million and adjusted EBITDA of $14 million for the first quarter of fiscal 2024." The press release further quoted Defendant Cohen in stating "[w]e will continue to innovate and build deployment capacity to support growth and increased profitability for our stakeholders." The press release continued, quoting Defendant Hibbard: "We initiated five system deployments and completed three systems during the first quarter as we delivered for our customers with a focus on excellence and speed of deployment."

26. That same day, the Company held an earnings call to discuss its financial results for the first quarter. In the opening remarks, Defendant Cohen noted "Our team set a new deployment record, completing the full build, installation, and commissioning process for an entire Symbotic system in only 20 months. While we can't currently deploy all systems this quickly, this reflects the deployment speed improvements we are making, and we are focused on further reductions in deployment time as we build capacity to support growing customer demand."

27. Defendant Hibbard further stated: "Our first quarter revenue grew to $369 million up nearly 80% compared to the same quarter last year and reflects an accelerated pace of growth from last quarter's 60% year-on-year growth. This was driven primarily by scale and the increasing number systems we have in deployment. During the first quarter, we initiated five new system deployments and completed three as we continue to add both new customers and additional projects for existing customers." Defendant Hibbard continued, commenting on the Company's business model:

> ***This demonstrates the high leverage in our business model showing that we can be profitable with such a small number of active sites with recurring revenue, while also being invested for the much larger number of systems still in deployment***. We continue to expect that as we scale over time that recurring gross margins can trend to over 60%. Operating leverage improved again sequentially as we achieved a 3.8% adjusted EBITDA rate compared to a 3.4% rate last quarter. This is driven by a rapid revenue growth and gross margin expansion along with stable operating expenses. Our cash and equivalents including marketable securities and restricted cash grew $129 million sequentially to $677 million. During the quarter, Walmart exercised its last remaining warrants at $10 per share, adding $159 million to our cash balance. [Emphasis added].

28. During the question-and-answer section of the call, the following exchange ensued regarding the Company's projected profitability:

> < Q. Piyush Avasthy – Citigroup > Hi. I think for the second quarter guidance, the implied EBITDA margin is modestly below from what you did in 1Q, maybe some color on what is impacting margins in this quarter? I'm taking a step back, I know

> you don’t give full year guidance, but when do you expect a more meaningful sequential improvement in margins?
>
> < A. Carol J. Hibbard > Thanks for your question, Piyush. Our guide for the second quarter reflects our flexibility to accommodate increased spending, if needed, as we need to accelerate deployment schedules and ensure we have a high quality deployment with as little disruption as possible. Ultimately, the customer satisfaction of that quality system rests on Symbotic. ***And so as we continue to ramp, we’re going to deploy resources as necessary to ensure we meet that schedule. So that’s what we’re seeing for the second quarter. And in terms of the longer term profitability, we continue to be on a trajectory to improve and you’re going to see that start to improve in the second half of the year, and year-over-year continued improvement in our profitability.*** [Emphasis added].

29. On May 6, 2024, the Company issued a press release reporting their second quarter results for fiscal year 2024 as follows: “Symbotic posted revenue of $424 million, a net loss of $41 million and adjusted EBITDA of $22 million.” The Company further issued guidance for the third quarter, anticipating “revenue of $450 million to $470 million, and adjusted EBITDA of $27 million to $29 million.”

30. During the same-day earnings call, the Company provided further details regarding their projected growth. Defendant Cohen highlighted “[k]ey innovations this quarter, include advancing our core technologies and artificial intelligence and automation, improving system performance and the customer experience, enhancing safety ***and accelerating deployment***.” (Emphasis added).

31. Defendant Hibbard spoke further to their second quarter margin trends before outlining the Company’s expectations for the third quarter, stating:

> Overall, non-GAAP gross margin was down slightly from last quarter, but still better than expected. The innovations we deployed during the second quarter weighed upon system gross margin, but were largely offset by effective cost management and solid project execution.
>
> System adjusted gross margin remained stable at 20% and generally in line with last quarter. ***As usual, our system gross margin also reflects burden of passthrough costs and lower-margin innovation projects that weigh on a reported***

> ***gross margin. Our combined recurring revenue streams contributed to positive adjusted gross profit. This demonstrates the high leverage in our business model, showing that we can be profitable with a small number of active sites generating recurring revenue, while also being invested for the much larger number of systems still in deployment***.
>
> ***
>
> Operating leverage improved again sequentially as we achieved a 5.3% adjusted EBITDA rate, compared to a 3.8% rate last quarter. This was driven by rapid revenue growth and gross margin expansion, along with stable operating expense.
>
> ***
>
> For the third quarter of fiscal 2024, we expect revenue of $450 million to $470 million and adjusted EBITDA between $27 million and $29 million. This represents revenue growth of over 47% and an adjusted EBITDA margin increase. [Emphasis added].

32. The question-and-answer portion of the call followed wherein Defendant Hibbard elaborated further on the Company's margins as follows:

> <Q: Nicole Sheree DeBlase – Dutsche Bank AG – Director and Lead Analyst> I wanted to ask a couple on the financials. So the first is the system's gross margin fell to low double digits. I think you guys talked about in the opening remarks how that was driven by all of this innovation that you're working on. I guess, how quickly can that gross margin step up to a high teens or better level? Is that something you expect in the second half? Or will these innovation headwinds continue?
>
> <A: Carol J. Hibbard> We did better than expected on gross margin. But as you indicated, we were stable quarter-over-quarter. And so a couple of items that weigh on our gross margin. So I'll talk about the things that are weighing on those gross margins now and then what we see for the future. So a couple of the things are the innovations that we have in work. ***We talked last quarter about focusing on additional resources to ensure quality deployments for some of those sizable projects we have in flow.***
>
> We have the benefit on many of our contracts that we have pass-through costs, so why we're able to pass that through with a profit that remains stable that it weighs on our gross margin.
>
> And then lastly, ***what's weighing on our gross margin is we have several lower margin projects in flow. And I would expect to see those start completing in the second half of this year. And so our 3Q guide reflects stable gross margins***. So

> as I said, we've got several significant milestones coming up in the second half of the year on some of these big projects. And gross margin won't improve every quarter, but we expect improvement in the coming years and that that will step up year-over-year.
>
> And as I mentioned earlier, just in terms of the unlock for gross margin, ***the single biggest one being the time it takes to deploy our system. And we continue to see steps in the right direction with each one that we're rolling out.***
>
> ***
>
> <Q: Derek John Soderberg – Cantor Fitzgerald & Co. – Research Analyst> Got it. And then as my follow-up, just to clarify some of your commentary, Carol, I think you said there are some lower-margin projects out there. Can you talk a bit about what's changing on the project front that would characterize a project as low margin at this point? And what kind of step-up in gross margins might we see after, I guess, some of these low-margin projects or work through this year? I'm just looking for you to kind of clarify some of that.
>
> <A: Carol J. Hibbard> Yes. ***So we've got projects in flow that were our earlier innovation projects, some of them fairly early systems, proof of concepts are included in there. And so as they burn off, you'll start to see our gross margin step up***. I'm not going to tie a specific time line to those because the schedules vary. But you should expect into next year gross margin to start stepping up. [Emphasis added].

33. On May 7, 2024, the Company filed its Quarterly Report on Form 10-Q with the SEC for the three months ended March 30, 2024 ("2Q24 10-Q"), signed by Defendant Hibbard. Therein, the Company further reported total revenue of $424.3 million, a net loss of $40.9 million, and adjusted EBITDA of $22.4 million. The 2Q24 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Cohen and Hibbard, attesting to the accuracy and truthfulness of the 2Q24 10-Q as well as to the effectiveness of the Company's disclosure controls.

34. On May 9, 2024, the Company conducted their annual Analyst/Investor Day presentation. During the question-and-answer portion of the call Defendant Hibbard spoke again on the Company's projected margins going forward as follows:

<Q: Andrew Alec Kaplowitz – Citigroup Inc. – MD & U.S. Industrial Sector Head> Andy Kaplowitz from Citigroup. I mean, clearly, you've always been focused on quality and safety and what have you. But it does seem like today, you're talking about sort of a real focus on Six Sigma and really improving the system. And I think, Carol, you talked about you're going to do some low-margin projects on the earnings call, and you did that big restructuring, Rick.

So does that mean a pretty big jump in gross margins as you look forward? I know you're not going to give guidance, all that kind of stuff. But like at the same time, I do sense like an increased focus and maybe you clear out stuff with that restructuring and sort of you move forward into next year on a higher playing field. Is that the right perception of what's going on here?

<A: Carol J. Hibbard> I'd say, yes, I'll start, and then I know you talked quite a bit about quality as did Aftab. And it's a huge focus, not just for cost though. It's a focus for scale. So you can't possibly scale if you have poor quality coming from your supply chain or we, in fact, aren't coming down the learning curve in terms of how we're commissioning. So it's both. There is a big focus on doing that, but I think the start of that focus was on how do you continue to scale and grow because with the backlog that we have, we have to deliver that backlog flawlessly so that we can continue to make room to improve and grow the rest of it.

35. The above-referenced statements were materially false and/or misleading. The Individual Defendants created the false impression that they possessed reliable information pertaining to the Company's projected earnings outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, the Company's optimistic reports of growth, improvements to gross margin, and overall stability of its ongoing projects fell short of reality; the Company was not equipped to timely deploy their systems or otherwise appropriately manage its expenses through project delays.

## THE TRUTH EMERGES

36. On July 29, 2024, the Company released their 3Q24 results below margin expectations and provided lower-than-expected Q4FY24 guidance as follows:

Symbotic posted revenue of $492 million, a net loss of $14 million and adjusted EBITDA of $15 million for the third quarter of fiscal 2024.

***

For the fourth quarter of fiscal 2024, Symbotic expects revenue of $455 million to $475 million, and adjusted EBITDA of $28 million to $32 million

37. The Company hosted an earnings call the same day which again included Defendants Cohen and Hibbard. During the call, Defendant Cohen highlighted the miss on gross margin expectations, stating: "Our third quarter reflects record revenue growth, strong recurring revenue gross margin, and careful management of operating expenses. However, our system gross margin reflects elongated construction schedules and implementation costs associated with last quarter's rapid pace of innovation."

38. Defendant Hibbard stated: "system gross margin fell below expectations due to schedule growth and higher labor costs during the quarter. We are focused on improving our planning, speed of implementation, and project management to enhance performance of the business."

39. During the question-and-answer portion of the call, Defendants Hibbard and Cohen elaborated on the issues that impacted their Q3 gross margins and Q4 projections:

<Q: Andrew Alec Kaplowitz – Citigroup Inc. – MD & U.S. Industrial Sector Head> Rick or carol, can you give a little more color into what happened with system gross margin and why it will rebound in Q4? Are you basically saying that in some cases, outsourcing is not working for your deployments? And maybe what's happened to convince you to take construction management again in-house, and what is the visibility into your Q4 expected margin improvement?

<A: Carol J. Hibbard> . . . So, on the outsourcing, as we talked about outsourcing, our primary reason why we chose outsourcing over a year ago was to go ahead and scale. And so, we did that across multiple areas of our supply chain so that we could also have redundancy.

We're looking at bringing back in-house just 1 element, which is the EPC, so the Engineering Procurement Construction piece of that. And we continue to own a piece of that. So, actually, Symbotic continued to deploy at some of our sites and then we had multiple supply chain partners off doing that.

What we're finding is why that's not a significant item in terms of the overall cost of the system, it's a significant item in terms of that final mile of installation when you're extremely focused on making sure that everything comes together. ***We're finding that focus on schedule and focus on cost, that's a critical point for us***. So, that's one of the elements that we're going to bring back in-house so that we have more control over that overall integration.

In terms of the other things that really drove our gross margin performance in this quarter, Rick mentioned we've had delays in construction creating inefficiencies. And so, some of our more complex projects, ***we've had delays around, for example, permits. And when you talk about a delay in the construction phase, this is after we've already deployed resources to each of those sites, which is extremely inefficient.***

And our projects are taking longer. I think last quarter I referred to some of the projects that we had in flow where we're not always going to see that 20-month deployment because I think I called them stragglers. ***And what we're seeing now is some of those complex systems where they're just taking longer. Longer system deployment creates higher costs.***

***

<A: Richard B. Cohen> Yes. I think the most important thing is our margin is down, but we're not a retail company, so we're not discounting. We're getting the gross profits that we want, but the projects have been costing more than we anticipated. Keep in mind, we've done about 40 projects so far. We have hundreds ahead of us.

***

***So, I think we made some choices. We could have fought with the customers over who pay some of these things***, but we said, let's just keep the customer happy. Let's keep the sales rolling. Some of these things we'll absorb now. And some of these things will not be expenses in the future, and I fully well expect our margin to come back. And our goal is to enhance the margin further. But just getting back to where everybody expected us to be would be a good place in the near term.

<Q: Andrew Alec Kaplowitz – Citigroup Inc. – MD & U.S. Industrial Sector Head> No, that's fair, Rick. And should we think about it though, as like in "onetime in Q3" and that's why it comes back in Q4? Because you're talking about normalized margins just in this current quarter, basically.

<A: Richard B. Cohen> Yes. I think I'll let Carol speak, but ***things like delays, because things weren't placed orders on time, and you have 200 people standing around the site, that's just not acceptable***. And we don't expect that to happen in the future. So, it's not like we'll go to 0 immediately, but most of this stuff should

> go away from what we're seeing and the people that we've hired in the fourth quarter. [Emphasis added].

40. The aforementioned press releases and statements made are in direct contrast to statements made during the May 6th earnings call and the subsequent May 9th investor/analyst day presentation. On those calls, the Company projected an outlook reflecting stable gross margins, highlighted their efforts to decrease costs related to slow deployment times, and claimed to put forth efforts to accelerate deployment cycles, while also continually minimizing risks associated with seasonality and the potential impact of the macro environment on the Company's future profitability.

41. Investors and analysts reacted immediately to the Company's revelation. The price of the Company's common stock declined dramatically. From a closing market price of $35.63 per share on July 29, 2024, the Company's stock price fell to $27.25 per share on July 30, 2024, a decline of about 23.52% in the span of just a single day.

42. A number of well-known analysts who had been following the Company lowered their price targets in response to the Company's disclosures. For instance, William Blair, while retaining its market perform rating, noted the Company third quarter adjusted EBITDA was "well below . . . consensus of $29.1 million" and the projected fourth quarter guidance "came in below … consensus" on both revenue, of $516.9 million, and EBITDA, of $38.9 million.

43. Similarly, BWS Financial Inc., while shifting to a sell rating, highlighted that "Sym's management referred to delays in permits and product delivery resulting in people not having anything to do. This is a characterization of a construction/contracting company and not one developing automated technology."

44. The fact that these analysts, and others, discussed the Company's shortfall and below-expectation projection suggests the public placed significant weight on the Company's prior

margin estimates. The frequent, in-depth discussion of the Company's guidance confirms that Defendants' statements during the Relevant Period were material.

## DAMAGE TO THE COMPANY

### Securities Class Action

45. On August 14, 2024, a securities class action complaint was filed in the United States District Court for the District of Massachusetts against the Company and Defendants Cohen and Hibbard. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Fox v. Symbotic Inc., et al.*, Case No. 1:24-cv-12090-MPK (D. Mass.) (the "Securities Class Action").

46. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

### Unjust Compensation

47. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

48. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed

to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

49. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

50. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

51. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

52. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward

## CORPORATE GOVERNANCE

53. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

54. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Business Conduct and Ethics**

55. At all relevant times hereto, the Company had in place its Code of Business Conduct and Ethics ("Code of Conduct") which is applicable to "[a]ll directors, officers and employees of the Company." The Code of Conduct was adopted to "[] promote honest and ethical conduct, including fair dealing and the ethical handling of conflicts of interest; [] promote full, fair, accurate, timely and understandable disclosure; [] promote compliance with applicable laws, rules and regulations; [] ensure the protection of the Company's legitimate business interests, including corporate opportunities, assets and confidential information; and [] deter wrongdoing."

56. In a section entitled "Honest and Candid Conduct," the Code of Conduct states:

> Each director, officer and employee owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest and candid. Deceit and subordination of principles are inconsistent with integrity. Each director, officer and employee must:
>
> - act with integrity, including being honest and candid while still maintaining the confidentiality of information where required or consistent with the Company's policies;
> - observe both the form and spirit of laws, rules and regulations, accounting standards and Company policies; and
> - adhere to a high standard of business ethics.

57. In a section entitled "Disclosure," the Code of Conduct states:

> Each director, officer or employee involved in the Company's disclosure process, including the President, the Chief Executive Officer, the Chief Financial Officer

and the Corporate Controller (the "Senior Financial Officers"), is required to be familiar with and comply with the Company's disclosure controls and procedures and internal control over financial reporting, to the extent relevant to his, her or their area of responsibility, so that the Company's public reports and documents filed or furnished with the SEC comply in all material respects with the applicable federal securities laws and SEC rules and regulations. In addition, each such person having direct or supervisory authority regarding such public reports and documents or the Company's other public communications concerning its general business, results, financial condition and prospects should, to the extent appropriate within his, her or their area of responsibility, consult with other Company officers and employees and take other appropriate steps regarding these disclosures with the goal of making full, fair, accurate, timely and understandable disclosure.

***

In addition, each director, officer or employee involved in the Company's disclosure process, including, without limitation, the Senior Financial Officers, must:

- familiarize himself, herself or themselves with the disclosure requirements applicable to the Company, as well as the business and financial operations of the Company;

- not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations;

- not take any action to fraudulently influence, coerce, manipulate or mislead any independent public accountant or certified public accountant engaged in the performance of an audit or review of the Company's financial statements that are required to be filed with the SEC if that person knew, or should have known, that such action could result in rendering such financial statements materially misleading; and

- properly review and critically analyze proposed disclosure for accuracy and completeness (or, where appropriate, delegate this task to others).

Each of the Company's employees, officers and directors that has responsibility for producing or maintaining any of the Company's accounting records shall exercise due care to cause such accounting records to fairly and accurately reflect, in all material respects, the transactions, occurrences, assets or liabilities to which they relate.

58. In a section entitled "Compliance," the Code of Conduct states, in relevant part:

> It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each director, officer and employee to adhere to the standards and restrictions imposed by those laws, rules and regulations.

59. Despite having this Code of Conduct, and the expectation that "[a]ll of the Company's directors, officers and employees are … to adhere to this Code," the Individual Defendants ignored their duties under the Code of Conduct and permitted and/or caused the Company to issue materially false and misleading statements in its SEC filings and other forums, in violation of the Code of Conduct and all applicable laws, rules and regulations.

**Audit Committee Charter**

60. At all relevant times, the Company had in place its Audit Committee Charter which set forth the additional duties and responsibilities of the Audit Committee members – Defendants Ford, Kane and Parekh. The Audit Committee Charter makes clear that the Committee's role is "to assist the Board's oversight of the Company's accounting and financial reporting processes and the audits of the Company's financial statements."

61. In a section entitled "Authority and Responsibilities," the Audit Committee Charter states, in relevant part:

> **General**
>
> The Audit Committee shall discharge its responsibilities, and shall assess the information provided by the Company's management, the internal auditors and the Company's registered public accounting firm (the "independent auditor"), in accordance with its business judgment. Management is responsible for the preparation, presentation and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company and for establishing and maintaining adequate internal control over financial reporting.
>
> ***
>
> **Audited Financial Statements**

[] Review and Discussion. The Audit Committee shall review and discuss with the Company's management, internal auditors and independent auditor the Company's audited financial statements, including the matters required to be discussed by the requirements of the PCAOB and the SEC.

[] Recommendation to Board Regarding Financial Statements. The Audit Committee shall consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

[] Audit Committee Report. The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

**Review of Other Financial Disclosures**

***

[] Earnings Release and Other Financial Information. The Audit Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, as well as other financial information and earnings guidance provided to analysts, rating agencies and/or otherwise publicly disclosed.

[] Quarterly Financial Statements. The Audit Committee shall discuss with the Company's management and independent auditor the Company's quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Controls and Procedures**

[] Oversight. The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of business conduct and ethics. The Audit Committee shall receive and review the reports of the Chief Executive Officer and the Chief Financial Officer required by Rule 13a-14 under the Exchange Act.

[] Risk Management. The Audit Committee shall discuss the Company's policies with respect to risk assessment and risk management, including with respect to financial, operational, privacy, security, cybersecurity, business continuity and legal and regulatory risks, as well as guidelines and policies to govern the process by which the Company's exposure to risk is handled.

***

> [] Additional Duties. The Audit Committee shall have such other duties as may be delegated from time to time by the Board.

62. Despite having these enumerated duties and responsibilities, the members of the Audit Committee failed to adequately discharge their duties as they permitted and/or caused the Company to issue false and misleading statements regarding its projected earnings outlook and anticipated growth.

**Corporate Governance Guidelines**

63. At all relevant times, the Company had in place its Corporate Governance Guidelines which were adopted to "assist the Board in the exercise of its duties and responsibilities and to serve the best interests of the Company and its stockholders."

64. In a section entitled "Director Responsibilities," the Corporate Governance Guidelines state, in relevant part:

> [] Oversee Management of the Company. The principal responsibility of the directors is to oversee the management of the Company and, in so doing, serve the best interests of the Company and its stockholders. This responsibility includes:
>
> - Reviewing and approving fundamental operating, financial and other corporate plans, strategies and objectives.
> - Evaluating the performance of the Company and its senior executives and taking appropriate action, including removal, when warranted.
> - Evaluating the Company's compensation programs on a regular basis and determining the compensation of its senior executives.
> - Reviewing and approving senior executive succession plans.
> - Evaluating whether corporate resources are used only for appropriate business purposes.
> - Establishing a corporate environment that promotes timely and effective disclosure (including robust and appropriate controls, procedures and incentives), fiscal accountability, high ethical standards and compliance with all applicable laws and regulations.

- Reviewing the Company's policies and practices with respect to risk assessment and risk management.

- Reviewing and approving material transactions and commitments not entered into in the ordinary course of business.

- Developing a corporate governance structure that allows and encourages the Board to fulfill its responsibilities.

- Providing advice and assistance to the Company's senior executives.

- Evaluating the overall effectiveness of the Board and its committees.

[] <u>Exercise Business Judgment</u>. In discharging their fiduciary duties, directors are expected to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders.

[] <u>Understand the Company and its Business</u>. Directors have an obligation to become and remain informed about the Company and its business, including the following:

- The principal operational and financial objectives, strategies and plans of the Company.

- The results of operations and financial condition of the Company and of significant subsidiaries and business segments.

- The relative standing of the Company as compared to competitors.

- The factors that determine the Company's success.

- The risks and problems that affect the Company's business and prospects.

[] Establish Effective Systems. Directors are responsible for determining that effective systems are in place for the periodic and timely reporting to the Board on important matters concerning the Company, including the following:

- Current business and financial performance, the degree of achievement of approved objectives and the need to address forward-planning issues.

- Future business prospects and forecasts, including actions, facilities, personnel and financial resources required to achieve forecasted results.

- Financial statements, with appropriate segment or divisional breakdowns.

- Compliance programs to assure the Company's compliance with law and corporate policies.
- Material litigation and governmental and regulatory matters.
- Occurrence of cybersecurity incidents or security breaches.
- Monitoring and, where appropriate, responding to communications from stockholders. Directors should also periodically review the integrity of the Company's internal control and management information systems.

65. In a section entitled "Risk Management," the Corporate Governance Guidelines state, in pertinent part:

> As provided in the Audit Committee Charter, the Audit Committee is responsible for discussing the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled. In accordance with those policies, the Board and the Board committees shall have an active role in overseeing management of the Company's risks. The Board shall regularly review information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. The Company's Compensation Committee shall be responsible for overseeing the management of risks relating to the Company's executive compensation plans and arrangements. The Company's Audit Committee shall oversee management of financial and cybersecurity risks and potential conflicts of interest. The Nominating and Corporate Governance Committee shall manage risks associated with the independence of the Board. While each committee shall be responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks.

66. Despite having adopted these Corporate Governance Guidelines, the Director Defendants failed to exercise prudent business judgment, effectively oversee management, or establish and/or maintain effective systems as they each permitted and/or caused the Company to issue false and misleading statements regarding its financial and business prospects.

**DUTIES OF THE DIRECTOR DEFENDANTS**

67. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business

practices and policies and assuring the integrity of its financial and business records.

68. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

69. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

70. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

71. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and

requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

72. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the

Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

73. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

74. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

75. Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

76. Plaintiffs are current owners of the Company's common stock and have continuously been owners of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

77. Because of the facts set forth herein, Plaintiffs have not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile

and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

78. The Company Board is currently comprised of seven (7) members – Defendants Cohen, Ford, Kane, Krasnow, Parekh, Rus and Saintil (*i.e.*, the Director Defendants). Thus, Plaintiffs are required to show that a majority of the Director Defendants, *i.e.*, four (4), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

79. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

80. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

81. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

82. Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and

requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

83. As a trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

84. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

85. Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

86. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

87. Despite having knowledge of the history of their own misconduct and

mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

**Defendant Cohen**

88. Defendant Cohen is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Cohen cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

89. As CEO, Defendant Cohen also fails the NASDAQ bright-line independence test as set forth in NASDAQ Listing Rule 5605(a)(2) and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant Cohen could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Cohen is therefore futile.

90. Defendant Cohen also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Cohen is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

91. In addition, Defendant Cohen receives lucrative compensation in connection with his employment with the Company. Defendant Cohen is not independent from Defendants Krasnow and Saintil as they comprise the Compensation Committee and are responsible for

evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Cohen. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Cohen could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

92. Because of Defendant Cohen's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Cohen is unable to comply with his fiduciary duties and prosecute this action. Defendant Cohen is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendants Ford, Kane, Krasnow and Saintil**

93. Defendants Ford, Kane, Krasnow and Saintil are each conflicted by virtue of their longstanding business relationship with each other as members of Warehouse's advisory board. Specifically, Defendant Ford served as a member of the advisory board from August 2016 through to June 2022. Defendant Kane served as a member of the advisory board from October 2020 through to June 2022. Defendant Krasnow served as a member of the advisory board from May 2016 through to June 2022. Defendant Saintil served as a member of the advisory board from October 2021 through to June 2022. As such, each of these Defendants are indebted to one another and could not reasonably and objectively consider a demand to sue each other for the wrongdoing alleged herein. As such, demand is futile as to each of them.

**Defendants Cohen and Krasnow**

94. The Company's 2024 Proxy Statements identifies that:

> Our founder, board chair, President and Chief Executive Officer, Richard Cohen, also serves as the Executive Chair of C&S Wholesale Grocers; and he and trusts for the benefit of his family are the only beneficial stockholders of that company. As a result, C&S Wholesale Grocers can be considered an affiliate of Symbotic. In addition, our Chief Strategy Officer, William Boyd, also serves as Executive Vice President and Chief Legal Officer of C&S Wholesale Grocers, our Chief Human Resources Officer, Miriam Ort, also serves as Chief Human Resources Officer of C&S Wholesale Grocers, and Todd Krasnow, a current director of the Company, is a member of the C&S Wholesale Grocers advisory board.

95. As such, Defendants Cohen and Krasnow are each conflicted as a result of their longstanding business relationship with one another, stemming from at least 2006. Accordingly, Defendants Cohen and Krasnow are each indebted to one another and could not reasonably and objectively consider a demand to sue each other for the wrongdoing alleged herein.

96. Moreover, the Company identified that C&S Wholesale was a related party under ASC 850 through the following transactions: (i) aircraft time sharing agreement; (ii) usage of facility and employee services; (iii) customer contracts; and (iv) shared services. As a result of these related party transactions, Defendants Cohen and Krasnow, as key individuals at C&S Wholesale, cannot be considered independent nor disinterested as any action they take on behalf of the Company could have an adverse impact on C&S Wholesale, the Company, and/or the Company's relationship with C&S Wholesale.

<u>**Defendants Kane, Ford and Parekh**</u>

97. During the Relevant Period, Defendants Kane, Ford and Parekh served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as

set forth in the Audit Committee Charter as set forth herein.

98. Defendants Kane, Ford and Parekh breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Kane, Ford and Parekh each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

99. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

100. The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

101. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and

disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

102. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

103. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

104. Publicly traded companies, such as the Company, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause

the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

105. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duties)

106. Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

107. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

108. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

109. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

110. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

111. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

## (Against the Individual Defendants for Gross Mismanagement)

112. Plaintiffs incorporate by reference and re-allege each allegation contained above, as though fully set forth herein.

113. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

114. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

115. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

## (Against the Individual Defendants for Waste of Corporate Assets)

116. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

117. The wrongful conduct alleged regarding the issuance of false and misleading

statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

118. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the unlawful actions alleged herein.

119. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

120. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

121. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

122. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

123. Plaintiffs, as shareholders and representatives of the Company seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including

any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**FIFTH CAUSE OF ACTION**

**(Against the Individual Defendants for Aiding and Abetting)**

124. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

125. The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

126. Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

127. The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

128. As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein

129. As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

130. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SIXTH CAUSE OF ACTION

**(Against the Director Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9))**

131. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

132. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

133. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

134. The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

135. The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy Statement filed with the SEC.

136. The 2024 Proxy Statement was used to solicit shareholder votes in connection with the re-election of the Director Defendants to the Board, among other things.

137. In discussing Risk Oversight, the 2024 Proxy Statement failed to disclose the risks of slow deployment times, seasonality, and the potential impact of the macro environment on the Company's future profitability which were known, or should have been known to the Director Defendants in the exercise of prudent business judgment. As such, the foregoing statement in the 2024 Proxy Statement was a half-truth, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

138. Furthermore, the Director Defendants' statement regarding the Company's Code of Conduct was materially false and misleading because the Director Defendants were not adhering to the Code of Conduct and were, in fact, acting in violation of the Code of Conduct.

139. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading.

140. The materially false and misleading statements contained in the 2024 Proxy Statement misleadingly induced shareholders to vote in favor of the election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to SYM.

141. The Company was damaged as a result of the Director Defendants' material

misrepresentations and omissions in the 2024 Proxy Statement.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' unjust enrichment;

D. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E. Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: October 2, 2024

**LAW OFFICE OF MICHAEL P. UTKE, LLC**

By: *_/s/ Michael P. Utke_*
Michael P. Utke
P.O. Box 360 Pepperell, MA 01463
Telephone: (617) 314-6600
Email: mutke@utkelaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiffs***